**RPLY**
CHRISTOPHER G. GELLNER, P.C.
CHRISTOPHER G. GELLNER, ESQ.
528 South Casino Center Blvd., Suite 305
Las Vegas, Nevada  89101
(702) 386-9393
Attorney for Debtor

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA
*****

| | |
|---|---|
| **VIRGIN RIVER 140, LLC,** | Case No.:  BK-S-13-14594-LED<br>Chapter 11 |
| Debtor. | Date of Hearing   May 20, 2014<br>Time of Hearing:  10:30 a.m. |

### REPLY TO DRB HOLDINGS, LLC'S OPPOSITION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION

**COMES NOW** the Debtor, Virgin River 140, LLC, and replies to the Opposition to Debtor's proposed Disclosure Statement filed by Creditor, DRB Holdings, LLC as follows:

A. **THE DEBTOR'S PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION**

The Debtor believes that its Disclosure Statement for Debtor's Plan of Reorganization filed with the Court on April 18, 2014 contains adequate information for the Creditors to adequately understand the Plan and to be able to vote intelligently on it.

Nonetheless, the Debtor has no problem with modifying the Disclosure Statement to describe the financial ability of the Debtor's members to show that they will be financially able to make the payments required by the Plan until an additional investor is firmed up or the property sold.  Member, George T. Bochanis, who owns 10.3% of the LLC and is a prominent personal injury attorney in Las Vegas, has indicated that he has sufficient financial ability to make the financial payments of $10,553.54 if he was required to do so.  However, that is not the case as the Plan payments will be made by the seven members of the LLC in proportion with their ownership interests, which will range from $749.29 per month for Kathy Arrington's 7.1% interest to $2,627.81 per month for Sarah M. Hutchison's 24.9% interest.

Mr. Bochanis' pro-rata payment of $1,087.00 per month would be quite easy for him to make and would leave him with available funds to assist other members who have a problem making the payment. Nonetheless, the Debtor does not believe that is going to happen in view of the fact that the payments are affordable to the members and they have a significant personal interest to protect by making the payments since there are personal guarantees involved.

**B.    THE DEBTOR'S PLAN IS CONFIRMABLE**

The Debtor's Plan is feasible under 11 USC §1129(11) which provides as follows:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Plan proposes that the Debtor will make a monthly mortgage payment on the refinanced secured debt owed to DRB Holdings, LLC in the amount of $7,979.43 per month, which payments have a 10-year duration. The Plan also proposes a payment of $804.21 per month for delinquent property taxes to the Clark County Assessor's Office for two years, as well as payments of $250.00 per month for five years to unsecured creditors and $1,519.89 per month for five years on the unsecured deficiency claim of DRB Holdings, LLC. The total monthly payments are $10,553.44 which can easily be made by the Debtor's members for the one year or so until an investor is firmed up, or the property is sold.

Mr. Bochanis is agreeable to loan the LLC any money that is necessary to make the payments, if any of the members default on their obligations to make their pro-rata payment. Again, there is a very strong inducement for the members to make their payments as they will want to protect themselves from the personal guarantees that they signed which could be collected if there was a foreclosure.

The Debtor never made adequate protection payments to DRB or its predecessor, Mr. Belding, because it was not required to do so under 11 USC §362(d)(3) which provides in pertinent part:

///

2

> (d) on request of the party in interest, and after notice and hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay - . . .
>   (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered in the 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later -
>   (A) the debtor has filed a plan of reorganization that has a reasonable probability of being confirmed within a reasonable time; or
>   (B) the debtor has commenced monthly payments that - . . .

Neither DRB Holdings nor Mr. Belding ever contacted the Debtor and informed it that DRB/Belding considered the Debtor to be a single asset real estate debtor and that it should commence adequate protection payments. The first the Debtor heard from DRB that adequate protection payments were sought was after the Debtor filed its Reorganization Plan. For the first ten months that the Debtor was in bankruptcy, the Debtor heard nothing from DRB or Mr. Belding about this issue. Since the Debtor has now filed its Reorganization Plan and that Plan has a reasonable possibility of being confirmed within a reasonable time, the payments referred to §362(d)(3) are not required.

As to DRB's objection to the treatment of its unsecured claim in Class VI, rather than being placed with the other unsecured creditors in Class V, there are business and/or economic justifications for putting DRB in a separate class. The Debtor should be allowed to treat the unsecured claim of DRB in Class VI differently from the unsecured creditors in Class V because part of DRB's total claim is secured and part is unsecured. The unsecured claim only has that status because the collateral for the claim declined in value since the debt was incurred. The part that is secured will be paid in full by deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, as required by §1129(b)(2)(A)(II). DRB's unsecured claim is being treated differently than those of other unsecured creditors, because a large portion of its claim, the secured portion, is being paid in full at a market interest rate. Under such circumstances, there is a business and/or economic reason for treating DRB's unsecured claim

differently than those of unsecured creditors. It has been placed in a separate class and the percentage of its allowed claim that the Debtor proposes to pay is less than what the Debtor proposes to pay other unsecured creditors in Class V because of its unique status (it has both secured and unsecured portions) and the size of the claim which is approximately $1.8 million dollars. Consequently, the Debtor has proposed payment of 5% of DRB's claim, as opposed to 10% for the unsecured creditors in Class V.

The Debtor did not place unsecured creditors in two separate classes because it was trying to gerrymander an affirmative vote on the Reorganization Plan which is prohibitive by the Ninth Circuit's ruling in Barakat v. Life Insurance Co. of Virginia, 99 F.3d 1520, 1526 (1996), but rather because the Debtor felt that the claims were significantly different from one another in terms of how they were created to justify separate classifications. Also, by placing the unsecured claims in two separate classes, the Debtor would be allowed from an economic standpoint to pay Class V at a 10% rate, while he could only afford to pay Class VI at a 5% rate.

11 USC §1122(a) provides as follows:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class.

Although the Bankruptcy Code requires substantially similar claims to be placed in a class, it does not state whether all substantially similar claims must be placed in the same class. Class V Nev. Claimants v. Dow Corning Corp., 280 F.3d 648, 661 (6th Cir., 2002), In re: National/Northway, Ltd., P'ship, 279 B.R. 17, 25 (Bankr. D. Mass. 2002). However, it is quite clear that the drafters of the Code did not intend that all claims of the same kind must be placed in the same classification in a reorganization plan. In Collier on Bankruptcy, ¶ 1122.03 [1] [a], the editors state as follows:

///

///

///

4

> If the drafters of the Code had intended that all claims of the same type be classified together, every holder of a general unsecured claim would be entitled to identical treatment under the plan. This would, for example, make it impossible to make effective use of Section 1124 which describes the conditions under which a claim is unimpaired (and therefore deemed to have accepted the plan under Section 1126). Since Congress obviously intended that the proponent of a plan had the flexibility to separately classify certain general unsecured claims, and thereby leave such claims unimpaired if such treatment was advantageous to the debtor, the argument that all claims of the same legal nature must be included within one class is not persuasive.

The Bankruptcy Code does not requires all unsecured claims to be placed within a similar class. Unsecured claims may be divided into separate classes if the separate classes are premised upon a legitimate business justification. American United Mutual Life Insurance Co., v. City of Avon Park, 311 U.S. 138, 61 S. Ct. 157, 85 L. Ed. 91 (1940). In this case, the Debtor has classified unsecured creditors into two different classes -- Class V and Class VI, due to the manner in which the claims in each class were created and the fact that the Debtor can only afford to pay a lower percentage to Creditor, DRB Holdings, in Class VI because of the size of the claim. The creditors in Class V are general unsecured creditors who never held a lien or security interest on the Debtor's property. On the contrary, DRB has a security interest on the Debtor's property, and its claim is only unsecured due the fact that value of the property has declined since the loan. Again, there is a business justification or economic purpose for separating DRB's claim out from the other unsecured creditors who provided services to the Debtor's business and were also unsecured.

For all the reasons set forth above, the Court should approve the Debtor's proposed Disclosure Statement, with some additional information being provided regarding the financial condition of the Debtor's individual members so that creditors can determine that they have the

///

///

///

///

financial wherewithal to make the Plan payments.

DATED: This 13th day of May, 2014.

                                                CHRISTOPHER G. GELLNER, P.C.

By: /s/ Christopher G. Gellner, Esq.
Christopher G. Gellner, Esq.
Nevada Bar Number 002556
528 S. Casino Center Blvd., Suite 305
Las Vegas, Nevada 89101
(702) 386-9393
Attorney for Debtor

## CERTIFICATE OF MAILING

Pursuant to N.R.C.P. 5(b), I hereby certify that on the 13th day of May, 2014, service of was **REPLY TO DRB HOLDINGS, LLC'S OPPOSITION TO DEBTOR'S PROPOSED DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION** made by depositing a true and correct copy of the same, enclosed in a sealed envelope upon which 1st class postage was fully prepaid in the U.S. Mail at Las Vegas, Nevada addressed as follows:

Steven R. Harris, Esq.
Harris Law Practice, LLC
6151 Lakeside Drive, Suite 2100
Reno, Nevada 89511
Attorney for DRB Holdings, LLC

/s/Terry Leif Erickson
Terry Leif Erickson, Legal Assistant to
Christopher G. Gellner, Esq.